UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA

| | |
|---|---|
| Pacira Pharmaceuticals, Inc.,<br><br>            Plaintiff<br><br>v.<br><br>Research Development Foundation,<br><br>            Defendant | Case No. 2:21-cv-02241-CDS-DJA<br><br>**Order Granting in Part Plaintiff's Motion for Partial Summary Judgment and Denying Defendant's Motions for Judgment on the Pleadings and for Summary Judgment**<br><br>[ECF Nos. 41, 99, 106] |

      Plaintiff Pacira Pharmaceuticals, Inc. sues defendant Research Development Foundation in this declaratory-judgment action arising out of a long-standing assignment agreement between the parties. In 1994, RDF assigned Pacira certain intellectual property, giving Pacira the exclusive right to manufacture and sell products employing that property, in exchange for a royalty on some of Pacira's gross revenues. The product relevant to this suit is called EXPAREL, an anesthetic that Pacira manufactures using two processes: a 45-liter (45L) process and a 200-liter (200L) process. The parties later disputed the extent of the 1994 agreement and executed both a 1997 letter agreement and a 2004 amendment to clarify key terms. But none of the three contracts explicitly contemplated EXPAREL. Now, the parties dispute whether Pacira owes royalties to RDF over EXPAREL.

      Pacira seeks (1) a declaration stating that it no longer owes royalties to RDF for EXPAREL made after December 24, 2021; and (2) a declaration invalidating the agreements as unconscionable because they require royalty payments after RDF's patents covering EXPAREL have expired. RDF countersues, essentially seeking the inverses of both declarations (that Pacira still owes RDF royalties and that the agreements are enforceable). There is no genuine dispute that the agreements are unenforceable as RDF now seeks to interpret them with respect to

EXPAREL manufactured using the 45L process, so I grant Pacira's motion for partial summary judgment. But there is a genuine dispute over whether Pacira owes royalties on EXPAREL manufactured using the 200L process, as it is unclear whether the patent that Pacira uses to manufacture 200L EXPAREL is "related to" the patent RDF previously assigned to it. I thus deny RDF's motion for summary judgment. I also deny as moot RDF's motion for judgment on the pleadings. The parties are instructed to participate in a mandatory settlement conference before the magistrate judge and, should they fail to settle, they are instructed to file a joint pretrial order no later than 14 days after the settlement conference.

I.   Background

   A.   RDF & Pacira

Pacira, formerly known as DepoTech Corporation and SkyePharma,[1] is a California pharmaceutical company that derives most of its revenue from sales of EXPAREL. Compl., ECF No. 1 at 2; Answer, ECF No. 18 at 13. RDF is a Nevada nonprofit that transfers technology from laboratories to companies by obtaining patents and licensing research discoveries. ECF No. 18 at 13. In the 1990s, Pacira began work on manufacturing multivesicular liposomes (MVLs) with various active drug ingredients. ECF No. 1 at 7–8. MVLs consist of a "honeycomb-like arrangement of hundreds of chambers, each encapsulating a drug, with that structure enabling delivery of the drug over a sustained period of time as the chambers break." ECF No. 99-7 at ¶¶ 29–33. In 1994, Pacira contracted with RDF to obtain certain experimental technology and intellectual property pertaining to MVLs in exchange for conditional royalty payments. *Id.* at 2. The parties disagreed about the scope of products for which Pacira would owe royalties, so they executed two amendments to the 1994 agreement—one in 1997 and another in 2004. ECF No. 18 at 16–17. Now, the parties disagree again about the scope of Pacira's royalty obligations.

---

[1] When the parties executed the 1994 agreement and the 1997 letter agreement, Pacira was known as DepoTech. When the parties executed the 2004 amendment, Pacira was known as Skye. I refer only to Pacira—and have altered quotes and external references—throughout this order for ease of understanding.

B.  EXPAREL

In 2011, the United States Food and Drug Administration approved Pacira's new drug application for EXPAREL, a technology using MVLs. *Id.* at 19–20. Pacira describes EXPAREL as a "first-of-its-kind, single dose local anesthetic administered at the time of surgery to control pain and reduce or eliminate the use of opioids for acute postsurgical pain." ECF No. 1 at 2. The active ingredient in EXPAREL, bupivacaine, is encapsulated in MVLs, allowing for its gradual release over time as lipid membranes are absorbed, "prolonging the action of bupivacaine." *Id.* EXPAREL is manufactured by two processes: a 45L process and a 200L process. ECF No. 122 at 16 n.2.

Pacira first used the 45L manufacturing process, which relied on RDF's original patented technology. *Id.* at 7–8. The United States Patent and Trademark Office issued Patent No. 9,585,838 on March 7, 2017, which described this MVL production. ECF No. 18-4 at 2. Both parties agree that the '838 patent was covered by the agreements and constituted "Original Patented Technology," for which Pacira owed RDF royalties. ECF No. 1 at 7. Pacira practiced the '838 patent in producing EXPAREL via the 45L process. *Id.* at 8. But Pacira now asserts that, beginning in 2013, it began to develop a larger scale process to manufacture EXPAREL that did not rely on technology provided by RDF. *Id.* at 8. It obtained Patent No. 11,033,495 on June 15, 2021, which describes manufacturing of bupivacaine MVLs. ECF No. 18-5 at 2. Pacira obtained a second patent, Patent No. 11,179,336, on November 23, 2021, which also discloses and claims aspects of manufacturing bupivacaine MVLs. ECF No. 18-6 at 2. It claims that it practices the '495 patent in manufacturing EXPAREL using the larger scale 200L process. ECF No. 1 at 8.

Pacira now asserts that the two new patents (the '495 and the '336 patents) are not "improvements" as defined by the agreements between itself and RDF and that revenues stemming therefrom are not subject to the royalty provision of those agreements. ECF No. 1 at 8. RDF disagrees, contending that the two patents are "DepoFoam Technology" and thus covered by the 2004 amendment. ECF No. 18 at 20–21, 25. For support, RDF points to the specific claims

made in the patents, public statements made by Pacira leadership, and press releases describing how EXPAREL utilizes DepoFoam technology. *Id.* at 22–24. Pacira also claims that any royalty provisions requiring it to pay royalties on EXPAREL manufactured by the 45L process are unenforceable, as the '838 patent has expired. ECF No. 106. Both parties agree that after the '838 patent expired, no valid patents remained to cover 45L EXPAREL. Hr'g Tr., ECF No. 150 at 7:15–17. While they also agree that the '495 patent covers 200L EXPAREL, they disagree as to whether Pacira owes royalties for its sale or use of 200L EXPAREL. And those disagreements are rooted in their differing interpretations of the 1994 and 2004 contracts.

   C. *The 1994 agreement*

   In 1994, RDF assigned Pacira certain "Assigned Proprietary Property," which gave Pacira exclusive rights to make, manufacture, and sell products employing that property. 1994 Agreement, ECF No. 99-1 at 6. In exchange, Pacira was to pay RDF a royalty on gross revenues—a term that would be changed by the 2004 agreement—but in 1994, it meant to cover charges collected by Pacira from sales, licensing, and production of a product. *Id.* at 5, 11. A product was defined as a "product or portion of a product that where made, used[,] or sold embodies an invention there claimed, or which is specifically intended to be used to practice a method or process there claimed in an Assigned Patent . . . and which is manufactured and sold by or for" Pacira. *Id.* at 4–5. "Assigned Patent" was defined to mean the patents included within the proprietary property and any reissue, continuation, or extension of them. *Id.* at 4. The proprietary property contemplated includes "developments, patent rights, copyrights, as well as all patent applications, techniques, methods, processes, apparatus, products, data, trade secrets, confidential information, improvements thereto, modifications thereof, and Know-How, whether patentable or not, related to the technology described in Exhibit 1[.]" *Id.* at 3. And Exhibit 1 describes various patented technologies, including "multivesicular liposomes having a biologically active substance encapsulated therein in the presence of a hydrochloride," "heterovesicular liposomes," "cyclodextrin liposomes encapsulating pharmacologic compounds

and methods for their use," and "uniform spherical multilamellar liposomes of defined and adjustable size distribution[.]" *Id.* at 30.

In sum, the 1994 agreement set the key terms for the arrangement: RDF would license its patented technology to Pacira in exchange for 2.5% of the gross revenues arising from that technology. And the royalties were to be paid "for a period extending from the first commercial revenue actually collected by [Pacira] for the life of the last to expire of the patents or patent applications of the Assigned Proprietary Property." *Id.* at 11. The agreement was amended by a letter between the parties in 1997. ECF No. 18-2. It confirmed the treatment of royalties and other consideration that Pacira would pay RDF but is otherwise irrelevant to this dispute.

D.  *The 2004 amendment*

The 2004 amendment broadened the definition "proprietary property," extending it to include Pacira's "multivesicular liposome DepoFoam technology which consists of microscopic, spherical particles composed of multiple non-concentric aqueous chambers encapsulating the biologically active substance therein in the presence or absence of any acid or salt or other compound (the 'DepoFoam Technology')." ECF No. 99-2 at 4. It noted that such DepoFoam Technology would include everything defined by Assigned Proprietary Property in the 1994 agreement as well as "existing and future patent or proprietary rights of [Pacira] in DepoFoam Technology whether or not covered by or subject to the Assignment Agreement." *Id.* The 2004 amendment also changed the definition of "gross revenues," such that it meant "charges actually collected by [Pacira] from sales, rental, lease, licensing, maintenance, or production of a Product or from licensing or the use of Proprietary Property by [Pacira] or a third party[.]" *Id.* at 3. Pacira and RDF executed this amendment on April 15, 2004. *Id.* at 10.

E.  *Procedural history*

The '838 patent expired on December 24, 2021. ECF No. 106 at 9. Pacira filed suit the day before expiration, anticipating that RDF would sue it for breach of contract if it stopped paying royalties thereafter. ECF No. 1. RDF answered and countersued, and the net result of both

5

parties' claims is that the parties request judicial determination about (1) whether Pacira owes RDF for its manufacture of EXPAREL and (2) whether any terms of the agreements requiring Pacira to pay RDF royalties after the expiration of the '838 patent are unenforceable. ECF No. 1 at 13–14; ECF No. 18 at 26–27. RDF now moves for judgment on the pleadings, as well as summary judgment. ECF Nos. 41, 99. Pacira moves for partial summary judgment with respect to EXPAREL manufactured using the 45L process only. ECF No. 106.

## II.   Legal standard

"The purpose of summary judgment is to avoid unnecessary trials when there is no dispute as to the facts before the court." *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994). Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable factfinder could find for the nonmoving party, and a dispute is "material" if it could affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Where reasonable minds could differ on the material facts at issue, however, summary judgment is not appropriate. *Id.* at 250–51. "The amount of evidence necessary to raise a genuine issue of material fact is enough 'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (quoting *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1968)). A principal purpose of summary judgment is "to isolate and dispose of factually unsupported claims." *Celotex*, 477 U.S. at 323–24.

The moving party—the one seeking summary judgment—bears the initial burden of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party satisfies the requirements of Federal Rule of Civil Procedure 56, the burden shifts to the party

resisting the motion to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. At the summary-judgment stage, "a court's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial." *Assur. Co. of Am. v. Ironshore Specialty Ins.*, 2015 WL 4579983, at *3 (D. Nev. July 29, 2015) (citing *Anderson*, 477 U.S. at 249). In evaluating a summary-judgment motion, a court views all facts and draws all inferences in the light most favorable to the nonmoving party. *Kaiser Cement Corp. v. Fischbach & Moore, Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986).

### III.    Discussion

RDF moves for summary judgment and judgment on the pleadings under Federal Rule of Civil Procedure 12(c). ECF Nos. 41, 99. Pacira also moves for summary judgment. ECF No. 106. All three motions are fully briefed, but a motion for judgment on the pleadings requires me to assume the truthfulness of the nonmoving party's allegations and prohibits me from considering the voluminous evidence that the parties have dutifully discovered. *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1550 (9th Cir. 1989). Because the parties have already completed discovery, I elect to decide the issues in light of the evidence obtained, rather than on the basis of unsupported allegations in the pleadings. *See Rios-Campbell v. U.S. Dep't of Com.*, 927 F.3d 21, 25 (1st Cir. 2019) ("[T]he parties briefed and argued summary judgment, and judicial efficiency would have been best served by dealing directly with those arguments rather than avoiding them.").[2] I thus deny as moot the defendants' motion for judgment on the pleadings[3] and turn to the motions for summary judgment.

---

[2] While *Rios-Campbell* is not binding on this court, I find its reasoning persuasive and adopt it insofar as it holds that district courts should adjudicate matters on the basis of a fully developed record when the parties have incurred great expense in developing that record, rather than on the pleadings alone. *See Jones v. L.A. Central Plaza, LLC*, 2023 WL 4754544 (9th Cir. July 26, 2023) (quoting *Rios-Campbell*, 927 F.3d at 26, for the proposition that a district court should not "travel back in time and train the lens of its inquiry on the bare allegations of the complaint while disregarding the compiled factual record upon which a summary judgment movant has elected to rely").

[3] My disposition of Pacira's motion for summary judgment necessarily moots RDF's motion for judgment on the pleadings.

*A. I grant Pacira summary judgment on Count II as to EXPAREL manufactured from the 45L process.*

Pacira seeks a declaratory judgment stating that any terms of the agreements requiring Pacira to pay royalties on sales of EXPAREL made from the 45L process after December 24, 2021, are unenforceable as a violation of public policy. ECF No. 106 at 21. Because I find that the agreements' terms are unenforceable to the extent that they require Pacira to pay royalties beyond the expiration dates of the patents covering the 45L process for manufacturing EXPAREL, I grant Pacira's motion for summary judgment as to Count II of the complaint.

Pacira claims that RDF's request for royalties on EXPAREL manufactured using the 45L process is foreclosed by the United States Supreme Court's decision in *Brulotte v. Thys Co.*, 379 U.S. 29 (1964), in which the Court held that "a patentee's use of a royalty agreement that projects beyond the expiration date of the patent is unlawful *per se*." ECF No. 106 at 19–21 (quoting *Brulotte*, 379 U.S. at 32). It asserts that following the expiration of RDF's '838 patent on December 24, 2021, RDF lacked another patent that would entitle it to royalties over EXPAREL manufactured using the 45L process. *Id.* It argues that the agreements' terms, as RDF now attempts to construe them, are (1) both substantively and procedurally unconscionable, and (2) violate public policy under *Brulotte* and its progeny. ECF No. 122 at 33–36. RDF responds that (1) the facts of *Brulotte* can be distinguished from this case, so reasoning from a separate line of cases beginning with *Automatic Radio Co. v. Hazeltine*, 339 U.S. 827 (1950) should be applied instead, ECF No. 123 at 22–25; and (2) even applying *Brulotte*, Pacira paid for the *discretion* to use RDF's patents rather than for the use of the patents themselves, ECF No. 99 at 35. For the reasons discussed below, I agree with Pacira.[4]

---

[4] The parties also both attempt to bolster their positions based on evidence extrinsic to the agreements, such as communications from RDF's executives or Pacira's outside counsel, but the 2004 agreement states that the 1994 and 2004 agreements "set out and constitute the entire understanding, warranties[,] and agreement of the parties." ECF No. 18-3 at ¶ 4.1. I find no ambiguity in either of the agreements and note that "ambiguity does not arise simply because the parties disagree on how to interpret their contract." *Galardi v. Naples Polaris, LLC*, 301 P.3d 364, 366 (Nev. 2013). And when the "language of the contract is clear and unambiguous, the contract will be enforced as written." *Am. First Fed. Credit Union v. Soro*, 359 P.3d 105, 106 (Nev. 2015). Because the parties agreed to construe their contract in accordance with Nevada law, ECF No. 18-3 at ¶ 4.3, I thus place no weight on what either party believed or

Any terms of the agreements requiring Pacira to pay RDF royalties on sales of EXPAREL manufactured using the 45L process after the expiration of the final RDF-controlled patent are unenforceable as a matter of public policy. "The aim of the patent laws is not only that members of the public shall be free to manufacture the product . . . disclosed by the expired patent, but also that the consuming public at large shall receive the benefits of the unrestricted exploitation, by others, of its disclosures." *Scott Paper Co. v. Marcalus Mfg. Co.*, 326 U.S. 249, 255 (1945). "Any attempted reservation or continuation in the patentee . . . of the patent monopoly, after the patent expires, **whatever the legal device employed**, runs counter to the policy and purpose of the patent laws." *Brulotte*, 379 U.S. at 31 (quoting *Scott Paper Co.*, 326 U.S. at 256) (emphasis added). And "the core feature of the patent laws on which *Brulotte* relied remains just the same" now as it did in 1964: "Section 154 now, as then, draws a sharp line cutting off patent rights after a set number of years. And this Court has continued to draw from that legislative choice a broad policy favoring unrestricted use of an invention after its patent's expiration." *Kimble v. Marvel Ent., LLC*, 576 U.S. 446, 459 (2015). Ultimately, after "'the grant of patent monopoly [is] spent' . . . an attempt to project it into another term by continuation of the licensing agreement is unenforceable." *Brulotte*, 379 U.S. at 34 (quoting *Ar-Tik Sys., Inc. v. Dairy Queen, Inc.*, 302 F.3d 496, 510 (3d Cir. 1962)).

RDF's attempts to distinguish this case from *Brulotte* are unavailing. Even if it is correct that *Brulotte* involved a marginally different licensing situation, that distinction fails in the face of *Kimble*. The plethora of cases[5] analyzing the licensing of patents in exchange for indefinite post-

---

represented in correspondence as the bases for Pacira's royalty payments. Instead, I define the parties' obligations solely by reference to the contractual language itself.

This reasoning also disposes of RDF's argument that Pacira, in 2012, identified the '648 patent as a basis to extend the lifespan of the royalty provision. ECF No. 99 at 34–35. I decline to adopt a theory of contract interpretation that permits RDF to expand Pacira's royalty obligations under a 2004 contract based solely on an email from Pacira's representatives regarding a patent application eight years later.

[5] *See, e.g.*, *Bradley Corp. v. Lawler Mfg. Co., Inc.*, 2020 WL 7027875, at *7 (S.D. Ind. Nov. 30, 2020) (finding license agreement that set forth a "single, non-diminishing royalty rate without a clear indication that the royalties [were] not subject to patent leverage" unlawful under *Brulotte*); *Goughnour v. Hayward Baker, Inc.*, 2018 WL 265588, at *7 (N.D.W. Va. Jan. 2, 2018) (finding an assignment that dealt "with one expired,

expiration royalties show that royalties extending beyond the life of the patents are unconscionable not only for their effects on the parties, but also because of how such payments could affect the "consuming public at large[, who] shall receive the benefits of unrestricted exploitation, by others, of its disclosures." *Scott Paper Co.*, 326 U.S. at 255. Patent policy "gave rise to the [*Brulotte*] Court's conclusion that post-patent royalty contracts are unenforceable[.]" *Kimble*, 576 U.S. at 463. RDF's assignment of its intellectual property to Pacira is similar enough in all significant respects to create a potential *Brulotte* problem insofar as RDF requests royalties on the **use** of its patents in perpetuity.

    I emphasize the word "use" because RDF also argues that the royalty payments are tied not just to Pacira's use of the now-expired patents, but in addition, any revenues it receives derived from the use of unpatented trade secrets or from licensing the intellectual property to third parties. ECF No. 148 at 15. It also argues—seemingly in the alternative—that Pacira acquired the privilege to use any or all of its patents as it so desired and the plain language requiring them to pay for that privilege does not conflict with the aforementioned rules against perpetual royalty payments. ECF No. 123 at 24. Both arguments essentially contend that the agreements create separate "triggers" for Pacira to pay royalties to RDF, including but not limited to, the single "trigger" for Pacira's use of the assigned patents, which can be distinguished from the conditions dictating the life of the agreements that are phrased in terms of the expiration of the last-to-expire patents. *Id.*

---

utilized patent, and one living, unutilized patent application" and projected royalties beyond date of expired patent unlawful under *Brulotte*). While RDF argues that *Bradley* can be distinguished because the *Bradley* licensing agreement "explicitly identified the royalty-bearing products," ECF No. 123 at 25 (citing *Bradley*, 2020 WL 7027875, at *7), its argument is unavailing. The *Bradley* court's holding was rooted in its finding that the royalty rate did not diminish post-expiration of the patent in question, not because the royalty-bearing products were mentioned by name in the agreement. And in any case, both parties agree that EXPAREL manufactured by the 45L process *was*, before the expiration of the '838 patent, one of the royalty-bearing products—despite not being mentioned by name in either the 1994 or 2004 agreements. RDF's attempt to project its patent monopoly past its expiration via royalty rights surely cannot turn on whether the royalty-bearing product was explicitly mentioned in the licensing agreement, and no such proposition is embodied in either *Brulotte* or the cases interpreting it thereafter.

To determine whether RDF's argument has merit, I turn back to the contract language. "Determining the reach of *Brulotte*'s barrier to the collection of royalties requires [me] to consider the scope of the royalty provision[s] . . . In other words, [I] must ask both what [Pacira] is paying royalties for and under what conditions its obligation to do so is lawful." *Zila, Inc. v. Tinnell*, 502 F.3d 1014, 1025 (9th Cir. 2007). This analysis "is simplicity itself to apply." *Kimble*, 576 U.S. at 459. I "need only ask whether [the] agreement provides royalties for post-expiration use of a patent. If not, no problem; if so, no dice." *Id.* The agreement itself does not: it states that "[r]oyalty payments . . . shall be paid for a period extending from the first commercial revenue actually collected by [Pacira] for the life of the last to expire of the patents or patent applications of the Assigned Proprietary Property." ECF No. 18-1 at ¶ 4.3. There is no *Brulotte* problem on the face of the agreement because it purports to halt royalty payments when the last of the patents described by "Assigned Proprietary Property" expires. And as the parties both agree, the last of those patents was the '838 patent.

The *Brulotte* issue arises only as RDF seeks to hold Pacira liable for royalty payments extending beyond the life of the '838 patent. Such liability, to the extent that any of the agreements' terms permit it, would violate the public policy of preventing patent royalty collection beyond the life of any of the patents assigned in exchange for those royalties. But that is exactly what RDF is attempting to do: it attempts to distinguish which of the payment "triggers" that Pacira is using in an attempt to prolong the royalty stream beyond the expiration date of those expired patents. The argument that each "trigger" is somehow separate from Pacira's "use" of the expired patents relies on a distinction without a difference.

RDF argues that some of the other "triggers" include revenues derived from Pacira's (or a third party's) use or licensing of proprietary property. ECF No. 148 at 11. It contends that the use of the now-expired patents would have been one such trigger, while use of other "unpatented trade secrets and processes" would be another. *Id.* But a closer look at the agreements belies this understanding: it is unclear when Pacira would be paying royalties on its use of the now-expired

patents as compared to paying royalties on its use of otherwise unpatentable intellectual property, as the payment "triggers" do not require Pacira to affirmatively distinguish which "trigger" under which it pays royalties. RDF's position, however, would have Pacira pay royalties on the sale or licensing of EXPAREL manufactured using the 45L process indefinitely, insofar as such revenue can be connected to any of the "triggers." But that brings up why the 1994 agreement contemplated that royalty payments would "cease for any patent which has been declared invalid[.]" ECF No. 18-1 at ¶ 4.3. The definitions of assigned proprietary property, proprietary property, and improvements all rely—in part—on the patents. The conditions dictating the lifespan of the royalty payments rely on the patents. And Pacira's 45L manufacturing of EXPAREL relied, in part, on improvements it made to the '838 patent. If RDF wanted to tie royalties to something *other* than Pacira's use of the patents, it chose strange contract language to realize that choice. And the agreements do not provide for any sort of diminution of royalty payment once the patents expired. *Cf. Kimble*, 576 U.S. at 454 (explaining that "post-expiration royalties are allowable so long as tied to a non-patent right" and giving an example in which a license involving both a patent and a trade secret can set a royalty at 5% during the patent period, but 4% later). Because the parties took great measures to specify that the expiration of the patents would be the cut-off date for Pacira's royalty obligations—and did not contract for any sort of reduced obligation in light of Pacira's potential continued use of RDF's unpatentable intellectual property—*Brulotte* forecloses Pacira's obligation to pay royalties on the 45L manufacturing process of EXPAREL.

      Finally, I address RDF's reliance on a proposition in *Automatic Radio* that a licensee "has nevertheless contracted to pay for the privilege of using existing patents plus any developments resulting from [] continued research." 339 U.S. at 834. In *Brulotte*, the Supreme Court explicitly declined to extend *Automatic Radio* to the context at-issue here. 379 U.S. at 33 ("We decline . . . to extend [*Automatic Radio*] so as to project the patent monopoly beyond the 17-year period."). Whether or not Pacira agreed to pay royalties on the use of the patents or on the discretion in

using the patents, RDF provides no valid law establishing that such an agreement may continue past the expiration date of those patents. The aforementioned cases describe such an idea as anathema to patent policy, while RDF's attempted "distinction between used and unused patents" seems pale in the face of the Supreme Court's admonition that "a patentee may not use the power of his patent to levy a charge for making, using, or selling products not within the reach of the monopoly granted" by the patent laws. *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 136–37 (1969). *Automatic Radio* "is not authority for the proposition that patentees have carte blanche . . . to condition the grant of patent licenses upon the payment of royalties on unpatented articles." *Id.* at 137. Because *Brulotte* controls RDF's attempt to project Pacira's royalty obligations beyond the expiration of the patents underlying the 45L manufacturing process of EXPAREL, I grant Pacira summary judgment on Count II of its complaint for declaratory relief and issue its requested declaratory judgment. And because any terms of the agreements that would require Pacira to pay royalties on sales of EXPAREL made from the 45L process after December 24, 2021, are unenforceable as a violation of public policy, I need not further determine whether Pacira owes royalties on EXPAREL made from the 45L process after December 24, 2021.

  B. *I deny RDF's motion for summary judgment as to EXPAREL manufactured from the 200L process.*[6]

  RDF argues that § 1.4 of the 2004 amendment, § 3.8 of the 1994 agreement, and § 1.1 of the 2004 amendment are three independent bases that each entitle it to royalties for Pacira's sale of 200L EXPAREL. ECF No. 99. Pacira responds that RDF's position is absurd, if accepted as true, would extend the lifespan of its royalty obligation indefinitely. ECF No. 122 at 16. It claims that

---

[6] RDF moves for summary judgment on both of Pacira's claims with respect to both production processes of EXPAREL. ECF No. 99 at 36. While my disposition of Pacira's motion technically forecloses me from granting RDF the exact relief it requests, I find that the interests of judicial economy and efficiency are best served by considering RDF's motion, rather than having the parties refile substantially the same motions but targeted explicitly to the 200L process. *See* ECF No. 122 at 16 n.2 (Pacira states that "RDF's first two arguments only apply to 200L EXPAREL"); ECF No. 150 at 7:9–11 (RDF's counsel states that "Grounds A and B" of RDF's motion for summary judgment "refer to the '495 patent which . . . only covers the 200L process").

RDF's arguments misinterpret or ignore key terms of the contracts, conflict with the parties' intent, and misapply law. *Id.*

"Contract interpretation is a question of law and, as long as no facts are in dispute, [courts] review[] contract issues" by "looking to the language of the agreement and the surrounding circumstances." *Redrock Valley Ranch, LLC v. Washoe County*, 254 P.3d 641, 647–48 (Nev. 2011). The goal of interpreting contracts "is to discern the intent of the contracting parties. Traditional rules of contract interpretation are employed to accomplish that result." *Davis v. Beling*, 278 P.3d 501, 515 (Nev. 2012) (internal quotation marks and citation omitted). I must first determine whether the "language of the contract is clear and unambiguous; if it is, the contract will be enforced as written." *Id.* The two contracts at issue "set out and constitute the entire understanding, warranties, and agreement of the parties" and defined terms in the 2004 amendment supersede any conflicting terms from the 1994 agreement. ECF No. 18-3 at ¶ 4.1.

The 1994 agreement contemplates royalties and states that Pacira "shall pay RDF during the term of this Agreement an earned royalty" of 2.5% on "Gross Revenues." ECF No. 18-1 at ¶ 4.1. Gross revenues are defined by the 2004 amendment as "charges actually collected by [Pacira] from sales, rental, lease, licensing, maintenance, or production of a Product or from licensing or the use of Proprietary Property by [Pacira] or a third party[.]" ECF No. 18-3 at ¶ 1.1. The 2004 amendment defines proprietary property as Pacira's MVL "DepoFoam technology," which includes "the Assigned Proprietary Property or Improvements as defined under the 1994 agreement and/or [] existing and future patent or proprietary rights of [Pacira] in DepoFoam Technology whether or not covered by or subject to the Assignment Agreement." *Id.* at ¶ 1.4.

As Pacira points out, RDF muddles terms between the two agreements without following the clear logical chain of the contracts. Section 4.1 of the 1994 agreement creates the royalty obligation and demands that it stems from gross revenues. Section 1.1 of the 2004 amendment defines gross revenues and demands that they stem from either sales of a product or from the licensing or use of proprietary property. RDF's first two arguments allege that because

14

the '495 patent is assigned proprietary property, EXPAREL is a product whose sales create a royalty obligation. For the reasons I address *infra* subsections *1* and *2*, I find a genuine dispute of material fact as to whether the '495 patent is indeed assigned proprietary property.

RDF's third argument contends that, even if Pacira does not sell a product that could be subject to the royalty provision, Pacira still uses proprietary property. Section 1.4 of the 2004 amendment creates two clear categories of proprietary property: the assigned proprietary property or improvements mentioned in the 1994 agreement, and existing and future patent or proprietary rights of Pacira in DepoFoam Technology. For the reasons I address *infra* subsection 3, I also find RDF's use theory unpersuasive.

> 1. *The '495 patent is not assigned proprietary property under § 1.4 of the 2004 agreement.*

RDF's first argument is that the '495 patent is assigned proprietary property. ECF No. 99 at 18, 19 ("RDF's position is simple . . . [t]he defined term Assigned Proprietary Property includes patents with a priority date after the Effective Date of the 2004 Amendment."). A quick look at the definition of that term, as provided by the 1994 agreement and not superseded in 2004, belies that understanding. It states that assigned proprietary property "shall mean and include the Proprietary Property, including the Patent Rights, Rights in Patents, and Know-How, all of which are assigned hereunder to" Pacira. ECF No. 18-1 at ¶ 1.4. As the '495 patent did not exist in 1994, it could not have been assigned to Pacira at that time. So § 1.4 of the 1994 agreement cannot be the singular clause recognizing the '495 patent as assigned proprietary property, and RDF seems to recognize that.

It instead argues that the 1994 definition of assigned proprietary property should be constrained by the 2004 definition of proprietary property. *See* ECF No. 99 at 19 (defining assigned proprietary property by reference to § 1.4 of the 2004 amendment). It contends that a patent qualifies as assigned proprietary property when it conforms to § 1.4, subpart (b) of the 2004 amendment. *Id.* This attempt improperly collapses the two distinct clauses of § 1.4 in the 2004 amendment. The phrase "and/or" and specific inventoried categories ("(a)" and "(b)") in

15

§ 1.4 of the 2004 amendment work to create two distinguishable categories of proprietary property: (a) the assigned proprietary property from the 1994 agreement, and (b) Pacira's existing or future IP in DepoFoam Technology. RDF cannot borrow language from that latter category to define the former when neither contract does so. I thus decline to consider the '495 patent assigned proprietary property based on the definition of proprietary property used in the 2004 amendment. Whether the '495 patent qualifies as an "existing and future patent or proprietary right" of Pacira would, at best, support an argument that the patent is proprietary property. But that is materially different from the patent being recognized as assigned proprietary property.[7] So I decline to find that § 1.4 of the 2004 agreement creates a royalty obligation covering Pacira's sales of 200L EXPAREL.

> 2. *There is a genuine dispute of material fact as to whether the '495 patent is assigned proprietary property under § 3.8 of the 1994 agreement.*

RDF argues that in the alternative, § 3.8 of the 1994 agreement creates a second basis to identify the '495 patent as assigned proprietary property. ECF No. 99 at 24. That section states that if either party "files patent applications or otherwise obtains patent rights . . . which relate to the Assigned Proprietary Property, such patent application [or] patent rights . . . shall be included in the Assigned Proprietary Property, and [Pacira] shall have exclusive worldwide rights thereto[.]" ECF No. 18-1 at § 3.8. RDF fails to establish the absence of a genuine dispute that the '495 patent relates to the assigned proprietary property, however.

It contends that the '495 patent is related to the same field of technology as the '572 patent and the '838 patent. ECF No. 99 at 28. Initially, this argument improperly expands § 3.8 beyond its literal terms: the contract specifies that the later patent must "relate to the Assigned Proprietary Property," not that it must relate to *the same field of technology* as the Assigned Proprietary Property. While it might be true that the patents all relate to the same field of

---

[7] Whether the '495 patent is proprietary property does affect RDF's use theory, but for the reasons I discuss *infra* subsection 3, I find that theory unavailing.

16

technology, such a definition is so expansive as to be meaningless—are they all science technology? chemistry technology? MVLs-encapsulating-biologically-active-substances technology?

The '495 patent is not necessarily related to the '572 patent. The '495 patent's disclosure "relates generally to commercial manufacturing processes for making [MVLs] using independently operating tangential flow filtration systems." ECF No. 18-5 at 11. Meanwhile, the '572 patent "relates to the composition of synthetic multivesicular lipid vesicles or liposomes encapsulating biologically active substances and to methods for their manufacture and use." ECF No. 99-3 at 5. The '495 patent thus seems to embody concepts relating to commercial manufacturing and tangential flow filtration systems, which are not mentioned in the '572 patent's brief description (and the '572 patent in its entirety does not mention "flow" or "filtration").

As Pacira points out, the '572 patent is directed to MVLs made with hydrochloride, while the '495 patent is not. ECF No. 122 at 27. And the '495 patent is directed to large-scale bupivacaine MVL production, while the '572 patent does not mention bupivacaine or large-scale production. *Id.* While RDF contends that Pacira's expert "offers no rebuttal to the basic fact that all three of the '572, '838, and '495 Patents relate to the same field of technology of [MVLs] encapsulating a biologically active substance," ECF No. 99 at 29 n.17, I again refuse to equate relating to the same field with relating to assigned proprietary property. RDF cannot attempt to broaden the scope of § 3.8's inquiry by importing phrases ("same field of technology") that do not exist in the contract language.

While RDF attempts to justify its definition of "relate to" by reference to various cases and dictionary definitions, some of its definitions support its position while others undercut it. For example, "connected in some way" is far more inclusive than "belonging to the same group." *Relate*, Black's Law Dictionary (11th ed. 2019). As the parties did not choose to define "relate to," and the degree of relation under any such definition is unclear, summary judgment is not the

17

appropriate stage for me to resolve the parties' differing views about whether the '495 patent and the '572 (or '838) patents are related. The question of relation is a genuinely disputed issue of material fact. And that question is essential to whether the '495 patent might be considered assigned proprietary property under § 3.8 of the 1994 agreement.

> 3. *RDF's use theory does not create a basis for Pacira's alleged royalty obligation.*

RDF's final theory is that § 1.1 of the 2004 amendment defines gross revenues to include Pacira's use of proprietary property, so any revenues that Pacira derives from the use of the intellectual property described by proprietary property support an ongoing royalty obligation. ECF No. 99 at 29–31. As the parties observe, this argument pertains to both the 45L and 200L processes of manufacturing EXPAREL. But because I have already decided that any attempt to collect royalties from Pacira's sale of 45L EXPAREL would be unenforceable, I decide this issue only in relation to 200L EXPAREL.

EXPAREL manufactured by the 200L process no doubt uses proprietary property, as the term is defined by the 2004 amendment. RDF contends that Pacira uses non-patent proprietary rights to manufacture EXPAREL and collects charges from that use when it sells EXPAREL. ECF No. 99 at 31. But, as Pacira identifies, its *use* of the proprietary property does not create gross revenue. ECF No. 122 at 28–29. Instead, it uses the proprietary property to create products, which it then sells to create gross revenue. Pacira concludes that to permit RDF to collect royalties on Pacira's use of proprietary property would render the clause permitting RDF to collect royalties on Pacira's sale of products using such property superfluous. *Id.* To read the contract RDF's way would create the following construction: "Gross Revenues shall mean charges actually collected by [Pacira] from . . . the use of Proprietary Property by [Pacira]." ECF No. 18-3 at ¶ 1.1 But RDF has not demonstrated that Pacira collects charges from itself for the use of proprietary property. It is unclear to me how Pacira could create revenue simply by *using* the proprietary property. The causal step of revenue generation comes from Pacira *selling* a product that is manufactured using the proprietary property. Pacira's researchers *used* the proprietary

property in developing a 200L manufacturing process from EXPAREL. But those scientific discoveries did not generate revenue. Pacira also *used* the proprietary property when it drafted documents, manuals, and patents describing the technology. But again, that drafting did not generate revenue. It was not until Pacira *sold* EXPAREL, a step which did not require the use of proprietary property, that Pacira generated revenues from it.

Because RDF has not demonstrated that any royalty-creating obligation relies on genuinely undisputed facts, it has not met its burden. I therefore decline to grant summary judgment with respect to 200L EXPAREL and instruct the parties to participate in a mandatory settlement conference before the magistrate judge assigned to this case. Should the case fail to settle, **a joint pretrial order will be due 14 days after the settlement conference.**

## IV. Conclusion

For these reasons, IT IS THEREFORE ORDERED that RDF's motion for judgment on the pleadings **[ECF No. 41] is DENIED as moot.**

IT IS FURTHER ORDERED that RDF's motion for summary judgment **[ECF No. 99] is DENIED.**

IT IS FURTHER ORDERED that Pacira's motion for summary judgment **[ECF No. 106] is GRANTED in part**.

IT IS DECLARED that any terms of the agreements that would require Pacira to pay royalties on sales of EXPAREL made from the 45L process after December 24, 2021, are unenforceable as a violation of public policy.

The Clerk of Court is kindly instructed to enter judgment accordingly.

DATED: August 8, 2023

_____
Cristina D. Silva
United States District Judge